**USDC-SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC#:**
**DATE FILED:** 02/27/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICK KATSORIS and THE LOUKOUMI
MAKE A DIFFERENCE FOUNDATION,
INC.

                    Plaintiffs,

          v.

WME IMG, LLC; IMG PRODUCTIONS,
LLC; and VIACOM d/b/a NICKELODEON

                    Defendants.

No. 16-CV-0135 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs Nick Katsoris and the Loukoumi Make a Difference Foundation, Inc. bring this

copyright infringement action against Defendants WME IMG, LLC, IMG Productions, LLC, and

Viacom Inc. Before the Court are Defendants' motion to dismiss Plaintiffs' Second Amended

Complaint and Plaintiffs' motion to compel arbitration. For the reasons set forth below, Plaintiffs'

motion to compel arbitration against WME IMG and IMG Productions, LLC (collectively, "IMG")

is granted, and Plaintiffs' claims against all Defendants are stayed pending arbitration.

## BACKGROUND

### A. The Parties

Nick Katsoris is the author of seven children's books featuring "Loukoumi," who has been

described as "a fluffy little lamb that just wants to make the world a better place." SAC ¶¶ 42–43.

The *Loukoumi* books "teach[] children life lessons including believing in and pursuing their

dreams, doing good deeds, and preventing bullying." SAC ¶ 42. In May 2014, Katsoris formed

the Loukoumi Make a Difference Foundation (the "Foundation"), a non-profit organization based

in New York. SAC ¶¶ 26, 48. The Foundation's mission is to "teach[] children to make a difference in their lives and the lives of others." SAC ¶ 26.

IMG is "a global leader in sports, events, media, and fashion." SAC ¶ 61. In 2014, WME acquired IMG to form WME IMG. SAC ¶ 61. Plaintiffs allege that WME IMG, LLC is the "successor-in-interest or parent of or otherwise responsible for satisfying any judgment against IMG Productions, LLC." SAC ¶ 30.

Viacom Inc. is a global mass-media company with interests in several media and entertainment properties, including Nickelodeon and Nick Jr. SAC ¶ 31; *see also* Viacom Inc. Mem. in Supp. of Mot. to Dismiss at 3 (ECF No. 30).

### B. *Make a Difference with Loukoumi* Television Special

In 2012, Katsoris approached IMG to represent him in pitching a reality television series based in part on the *Loukoumi* book series. SAC ¶ 78. Katsoris drafted a proposal for the show, which explained that "[i]n this television segment kids would live their Dream Days by following a different career choice in each episode." SAC ¶¶ 80–81. Katsoris and IMG pitched the proposal to television networks, including PBS Kids and Sprout. SAC ¶ 82. Those pitches were not successful, and IMG suggested that Katsoris improve the pitch materials and self-finance or seek sponsors to attract network attention. *See* SAC ¶¶ 82, 84–85.

On May 28, 2014, the Foundation and IMG Productions, LLC entered into a work-for-hire agreement, under which IMG Productions, LLC agreed to produce a television special tentatively titled "Make a Difference with Loukoumi TV Special" (the "TV Special"). SAC ¶ 90, Ex. I. The agreement provided that "[a]ll services rendered by [IMG Productions, LLC] pursuant to this Agreement . . . including . . . all notes, ideas, 'gags,' suggestions, plots, characters, logos, titles, themes, songs, products and/or stories . . . have been and/or will be solely created by [IMG

2

Productions, LLC] as a 'work made for hire.'" SAC Ex. I § 8. The agreement specified that the

Foundation would be "deemed . . . the sole and exclusive owner . . . of all rights of every kind or

nature . . . including, but not limited to, all copyrights [and] trademarks" in the material. SAC Ex.

I § 8.

The agreement also contained an arbitration provision. SAC Ex. I § 12(b). Under this

provision:

> Any dispute arising under this Agreement will be first referred for resolution to the
> respective designees of [the Foundation] and [IMG Productions, LLC]. To the
> extent that the designees of the parties cannot resolve the dispute within five (5)
> business days of referral to them, the parties agree to try in good faith to settle the
> dispute by non-binding mediation under the Commercial Mediation Rules of the
> American Arbitration Association before resorting to arbitration. . . .  In the event
> a dispute arises under this Agreement which cannot be resolved through mediation,
> such dispute will be submitted to arbitration and resolved by a single arbitrator . . .
> in accordance with the Commercial Arbitration Rules of the American Arbitration
> Association then in effect.

SAC Ex. I § 12(b).

The TV Special was produced in the summer of 2014. SAC ¶ 93. Hosted by professional

chef Cat Cora, the TV Special lasts approximately thirty minutes and features multiple segments.

*See* SAC ¶ 95.[1] Most relevant to this dispute, the TV Special includes a segment in which Sophia,

a child who aspires to be a Broadway star, is introduced to Constantine Maroulis, an actor known

for his role in the Broadway musical *Rock of Ages*. *See id.* Sophia and Maroulis discuss the

importance of hard work, visit a Broadway theater, and perform a duet to "Don't Stop Believin.'"

---

[1] The TV Special is available at *Make a Difference with Loukoumi Television Special*, Youtube
(Nov. 7, 2014), https://www.youtube.com/watch?feature=youtu.be&v=MAL6ZdH-S_o&app=desktop.
*See* SAC ¶ 95.

3

*Id.* In October 2014, Fox broadcast stations aired the TV Special nationwide. SAC ¶ 8.[2]

On July 22, 2015, Plaintiffs presented the TV Special and other pitch materials to representatives of Nickelodeon or Nick Jr. SAC ¶ 132. After initially expressing interest in Plaintiffs' proposal, Nickelodeon rejected it. *See* SAC ¶¶ 135, 138. Specifically, on August 27, 2015, Nickelodeon representative Elly Kramer sent Katsoris an e-mail, explaining "[w]e very much appreciate what you've created and love the idea of encouraging kids to make a difference" but "[u]nfortunately the project does not support what we're currently looking for." SAC ¶ 138, Ex. P.

## C. *All In with Cam Newton*

On June 13, 2015, Nickelodeon announced a development deal with IMG for a "brand-new reality show" featuring NFL quarterback Cam Newton. SAC ¶ 112, Ex. L. The announcement indicated that the "currently untitled unscripted television series will help kids find their dreams, from an aspiring Cirque du Soleil performer to a meteorologist." SAC Ex. L.

On September 22, 2015, Nickelodeon issued a press release announcing the greenlight of its "new adventure-filled docu-series I Wanna Be (Working Title)," hosted by Newton. SAC Ex. Q. The press release explained:

> In each episode Newton will step into the lives of two different kids and take them on a journey that will push them closer to fulfilling their dreams. From decorating award-winning cakes, to landing a spot on a Broadway stage, kids will be mentored by experts and supported by Newton as he cheers them on, and participates in the action, every step of the way.

*Id.* The show began airing in 2016 under the title *All In with Cam Newton*. *See* SAC ¶ 149.

---

[2] The United States Copyright Office issued a copyright registration for the TV Special, titled *Make a Difference with Loukoumi*, effective January 8, 2015. *See* SAC ¶ 96, Ex. J.

4

Each episode of *All In with Cam Newton* follows a similar structure. Approximately 23 minutes in length, each episode begins with an uplifting introduction by Cam Newton, who tells the audience, "I believe every kid has a dream inside them." *See, e.g.*, McNamara Decl. in Supp. of Mot. to Dismiss ("McNamara Decl.") Ex. E (ECF No. 58-5). Newton meets with two children per episode and discusses their career objectives. *See, e.g.*, *id.* The children's goals range from starring on Broadway to playing in the WNBA. *See* McNamara Decl. Ex. F. (ECF No. 58-6); McNamara Suppl. Decl. Ex. I (ECF No. 77-3). Newton then introduces each child to an expert in the field she hopes to enter. *See, e.g.*, *id.* The expert speaks with the child about her goals and works with the child to improve her skills. *See, e.g.*, *id.* Along the way, Newton motivates the child and provides comic relief. *See, e.g.*, *id.* Each child's segment concludes with a performance in which the child demonstrates the skills she has learned. *See, e.g.*, *id.*

## D. Procedural History

On November 24, 2015, Plaintiffs sent a cease-and-desist letter to Nickelodeon, Viacom and IMG. SAC ¶ 151. On December 15, 2015, Plaintiffs sent a letter to IMG, referencing the arbitration provision in the work-for-hire agreement and requesting dates for mediation. SAC Ex. R (ECF No. 52-18). On December 23, 2015, IMG allegedly sent Plaintiffs a letter indicating that IMG would mediate the dispute and would propose mediation dates in January 2016. *See* Pls.' Letter of May 16, 2016, at 2 (ECF No. 47).

On January 7, 2016, Plaintiffs filed a complaint in this action. *See* Compl. (ECF No. 1). Plaintiffs asserted seven causes of action, including claims under the Copyright Act, the Lanham Act, and state law. *See* Compl. ¶¶ 155–232. Citing the work-for-hire agreement with IMG Productions, the complaint also sought an "injunction in aid of arbitration under the Federal Arbitration Act" against IMG. Compl. ¶¶ 222–32.

On January 11, 2016, four days after filing their complaint, Plaintiffs e-mailed IMG to request dates for mediation. *See* Pls.' Letter of May 25, 2016 Ex. A (ECF No. 51-1). IMG responded the next day, indicating that it would be "happy to discuss" mediation. *See id.* On January 13, 2016, Viacom sent Katsoris an e-mail agreeing to "hold the action in abeyance pending [Plaintiffs'] anticipated mediation with IMG." *Id.* Viacom also told Katsoris that it "has no mediation agreement with [Plaintiffs] and will not be participating in any such mediation." *Id.*[3]

In February 2016, approximately one month after the complaint was filed, Plaintiffs and IMG exchanged several e-mails discussing a mediation schedule and potential mediators. *See id.* IMG stated that it was "happy to have a mediation and would participate in one in good faith," and that, "despite a bit of a scheduling jam on [its counsel's] side of things," it was "happy to try to get a mediation on the calendar." *Id.* IMG further suggested that the parties "set a date for mediation and do a stipulation and proposed order that [IMG] can respond to the complaint 30 days after the mediation." *Id.* During this period, IMG also proposed mediators to Plaintiffs. *Id.*

On March 1, 2016, Plaintiffs filed a formal request for mediation against IMG Productions with the American Arbitration Association (AAA). *See* Pls.' Letter of May 16, 2016 Ex. C (ECF No. 47-3). On March 16, 2016, however, Plaintiffs sent IMG an e-mail memorializing a conversation in which IMG had informed Plaintiffs that, in its view, neither mediation nor arbitration was required. *See* Pls.' Letter of May 25, 2016 Ex. A (ECF No. 51-1). Yet the next day, the Court endorsed the parties' stipulation, which provided that "Plaintiffs and the WME Defendants have agreed to explore the potential for mediation of their dispute" and holding

---

[3] On March 11, 2016, Viacom sent Plaintiffs a letter identifying alleged defects in their complaint. *See* Fink Decl. Ex. 1 (ECF No. 86-1).

Defendants' time to respond to the complaint in abeyance. *See* Order (Mar. 17, 2016) (ECF No. 25). On April 1, 2016, Plaintiffs filed their first amended complaint, which added new allegations and again sought an "injunction in aid of arbitration." *See* First Am. Compl. ¶¶ 227–37 (ECF No. 26).

On April 29, 2016, the AAA advised Plaintiffs that IMG had refused to engage in mediation. *See* Pls.' Letter of May 16, 2016 Ex. B (ECF No. 47-2). Plaintiffs immediately notified IMG, calling the AAA's statement "a complete surprise" and asking IMG to confirm that they had, in fact, refused to mediate. *Id.* Three days later, on May 2, 2016, Defendants moved to dismiss the First Amended Complaint, *see* ECF Nos. 29, 33, arguing among other things that Plaintiffs could not claim copyright protection in "common ideas of transformation, dreams, and goal-setting and use of scenarios involving celebrities and guest stars," Viacom Mem. in Supp. of Mot. to Dismiss at 12 (ECF No. 30).

On May 16, 2016, Plaintiffs submitted a letter to the Court stating that they "cross-move to compel arbitration" between the Foundation and IMG. *See* Pls.' Letter of May 16, 2016 (ECF No. 47). Plaintiffs' letter also requested a stay of the action pending arbitration or, in the event the Court denied their request for a stay, additional time to file a Second Amended Complaint. *See id.* On May 19, 2016, Plaintiffs filed their Second Amended Complaint. *See* SAC (ECF No. 52). On May 27, 2016, the Court held a conference, during which the Court instructed Plaintiffs to file a formal motion to compel arbitration, supported by briefing, no later than June 27, 2016. *See* Tr. of May 27, 2016 Conf. at 7:5–6 (ECF No. 63).

On June 13, 2016, Defendants moved to dismiss the Second Amended Complaint. *See* ECF Nos. 53, 56. On June 27, 2016, Plaintiffs (1) filed a motion to compel arbitration, ECF No. 66, (2) filed an opposition to Defendants' motions to dismiss, ECF No. 71, and (3) voluntarily

7

dismissed their third and fourth claims, ECF No. 65.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Enacted to "revers[e] centuries of judicial hostility to arbitration agreements," *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 119 (2d Cir. 1991) (citation omitted), the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). "This policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (alteration omitted) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)). "But the FAA 'does not require parties to arbitrate when they have not agreed to do so.'" *Id.* (quoting *Schnabel*, 697 F.3d at 118); *accord AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (citation omitted)).

Under the FAA, a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "In resolving a claim that an action must be arbitrated pursuant to an arbitration agreement, [a district court] must determine: (1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." *Begonja v.*

8

*Vornado Realty Tr.*, 159 F. Supp. 3d 402, 408–09 (S.D.N.Y. 2016) (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)).

"In deciding motions to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). A court must therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all reasonable inferences in favor of the non-moving party." *Id.* (citations omitted).

## DISCUSSION

### A. Waiver

Defendants argue that Plaintiffs have waived any right to arbitrate this dispute. *See* IMG Opp'n Mem. at 8–12 (ECF No. 85); Viacom Opp'n Mem. at 19–22 (ECF No. 87). The Court disagrees.

The "strong federal policy favoring arbitration . . . ha[s] led to its corollary that any doubts concerning whether there has been a waiver are resolved in favor of arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995). As the Second Circuit has repeatedly emphasized, "waiver of the right to arbitration is not to be lightly inferred." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 104–105 (2d Cir. 2002) (per curiam) (citation omitted); *see also PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997). But "there is nothing irrevocable about an agreement to arbitrate," and "under a variety of circumstances one party may waive or destroy by his conduct his right to insist upon arbitration." *Baker & Taylor, Inc. v. AlphaCraze.Com Corp.*, 602 F.3d 486, 490 (2d Cir. 2010) (per curiam) (citation and alterations omitted).

"In determining whether a party has waived its right to arbitration by expressing its intent

9

to litigate the dispute in question, [the Court] consider[s] the following three factors: '(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice.'" *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir. 2001)). "The key to a waiver analysis is prejudice." *Thyssen*, 310 F.3d at 105. In the Second Circuit, prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *PPG Indus.*, 128 F.3d at 107 (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997)).

The Second Circuit has generally found that a party waives its right to arbitrate "when it engages in protracted litigation," such as "extensive pre-trial discovery" and "substantive motions" over the course of several months before seeking arbitration. *Id.* at 107–08. In *PPG Industries, Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103 (2d Cir. 1997), for example, the Second Circuit concluded that a plaintiff waived its right to arbitrate by "engaging in discovery" and "filing substantive motions" in a related action for "approximately five months" before moving to compel arbitration, which "evidenced a preference for litigation that supports a finding of waiver." *Id.* at 108–09. In *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20 (2d Cir. 1995), the Second Circuit similarly found that a party had waived its right to arbitration by submitting and amending several pleadings, engaging in an "energetic pursuit discovery," and waiting seven months—until "the eleventh hour, with trial imminent"—to seek enforcement of an arbitration agreement. *Id.* at 26. More recently, in *Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156 (2d Cir. 2010), the Second Circuit held that a plaintiff

10

waived its right to arbitrate by waiting eleven months to move to compel arbitration while defendants filed procedural motions, submitted a lengthy "letter detailing perceived deficiencies" in the complaint, and "began work on a motion for judgment on the pleadings," though discovery had not yet begun. *Id.* at 159–60.

In this case, Defendants have not shown that Plaintiffs waived their right to arbitrate. First, no time at all elapsed between Plaintiffs' initiation of this action and their request for arbitration: Plaintiffs' complaint sought an "injunction in aid of arbitration" against IMG under the FAA. *See* Compl. ¶¶ 222–32. Moreover, in the weeks prior to filing their complaint, Plaintiffs contacted IMG to express their interest in mediation—a prerequisite to arbitration under the arbitration agreement—and to request dates on which IMG could participate in such mediation. *See* SAC Ex. R. Once the complaint was filed, Plaintiffs continued to consistently pursue arbitration. Indeed, only four days after filing the complaint, Plaintiffs again asked IMG to schedule mediation. *See* Pls.' Letter of May 25, 2016 Ex. 1 (ECF No. 51-1). And over the next six weeks, Plaintiffs engaged in several discussions with IMG about the mediation schedule and potential mediators. *Id.* When those discussions were not fruitful, Plaintiffs filed a formal request for mediation with the AAA. *See* Pls.' Letter of May 16, 2016 Ex. C (ECF No. 47-3). Thus, rather than sitting on their right to arbitrate, Plaintiffs sought arbitration before filing their complaint, in the complaint itself, and within days of initiating this action.

Defendants correctly note that Plaintiffs did not file a formal motion to compel until June 27, 2016, more than five months after filing their complaint. *See* Mot. to Compel Arbitration (ECF No. 66). In determining whether Plaintiffs waived their right to arbitrate, however, it is not clear that Plaintiffs' delay in seeking arbitration should be measured from their filing of the motion to compel, rather than their prior requests arbitrate in their complaint, in letters and e-mails to IMG,

11

or in their May 16, 2016 letter to the Court indicating that they "cross-move to compel arbitration." ECF Nos. 47, 51-1; *see, e.g.*, *Tokio Marine & Fire Ins. Co. v. M/V Saffron Trader*, 257 F. Supp. 2d 651, 655 (S.D.N.Y. 2003) (finding that "no time elapsed from the commencement of the litigation and the time when arbitration was requested," where the plaintiff requested to arbitrate "at the outset of litigation in the Complaint" even though "the actual motion to compel arbitration was submitted five months" later). Even if it were, this five-month period is not sufficient, standing alone, to infer waiver of arbitration. *See, e.g.*, *PPG Indus.*, 128 F.3d at 108 (holding that a "five-month delay, by itself" between "the time defendants asserted arbitrable claims and [the plaintiff] filed its motion to compel" is "not enough to infer waiver of arbitration"); *LG Elecs., Inc. v. Wi-LAN USA, Inc.*, No. 13-CV-2237 (RA), 2015 WL 4578537, at *2 (S.D.N.Y. July 29, 2015) (finding that "a four month delay in seeking arbitration is, by itself, insufficient to establish waiver"); *Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) (finding that a period of "approximately four months" between "the filing of this action and the filing of plaintiff's demand for arbitration" was "not, by itself, long enough to infer waiver"), *aff'd*, 205 F.3d 1324 (2d Cir. 1999); *cf. La. Stadium*, 626 F.3d at 159 (finding waiver where "[e]leven months elapsed" between a plaintiff's filings in state and federal court and its motion to compel arbitration).

Moreover, Plaintiffs' five-month delay in filing a motion to compel arbitration is reasonable in light of the terms of the arbitration agreement. Under the agreement, the parties were required to attempt to resolve their dispute first through their designees and second through non-binding mediation before submitting their dispute to arbitration. *See* SAC Ex. I § 12(b). Plaintiffs attempted to initiate non-binding mediation—a condition precedent to arbitration—in a letter to IMG before filing their complaint, *see* SAC Ex. R, and in a formal request for mediation on March

12

1, 2016, *see* Pls. Letter of May 16, 2016 Ex. C (ECF No. 47-3). Under these circumstances, Plaintiffs' decision to wait until after IMG formally refused mediation to file their motion to compel arbitration was consistent with the structure of the arbitration agreement, which contemplates non-binding mediation as a precursor to arbitration. And once Plaintiffs learned that IMG had denied their request for mediation with the AAA, they moved to compel arbitration, submitting a letter to the Court "cross-mov[ing] to compel arbitration" less than three weeks later. Pls.' Letter of May 16, 2016 (ECF No. 47). Thus, throughout the five-month period between the commencement of this litigation and Plaintiffs' motion to compel arbitration, Plaintiffs diligently pursued arbitration according to the terms of their arbitration agreement.

Second, "the amount of litigation to date" does not weigh in favor of a finding that Plaintiffs waived their right to arbitrate. *La. Stadium*, 626 F.3d at 159. Although the parties have briefed outstanding motions, they have not conducted any discovery. *See LG Elecs., Inc. v. Wi-Lan USA, Inc.*, 623 F. App'x 568, 570 (2d Cir. 2015) (summary order) (finding that a party did not waive its right to arbitrate where "no discovery took place and only a few motions were filed" before it requested arbitration); *cf. PPG Indus.*, 128 F.3d at 107 (finding waiver based in part on extensive pre-trial discovery); *Leadertex*, 67 F.3d at 26 (finding waiver in light of a party's "energetic pursuit of discovery"). Moreover, Plaintiffs did not initiate any motion practice before moving to compel arbitration. To be sure, this litigation heated up *after* Plaintiffs moved to compel arbitration: Plaintiffs opposed Defendants' motions to dismiss, *see* ECF No. 71, moved to strike portions of Defendants' submissions, *see* ECF No. 91, requested discovery, *see* ECF No. 91, and submitted briefing and affidavits in support of their motion to compel arbitration, *see* ECF Nos. 67, 68, 69, 96, 97. At the time that Plaintiffs moved to compel arbitration, however, they had not yet filed or responded to any substantive motion in this action.

13

Defendants stress that Plaintiffs nonetheless filed three complaints, which prompted Defendants to send Plaintiffs a deficiency letter and file two motions to dismiss. *See* ECF Nos. 29, 33, 53, 56, 86-1. Defendants are right that, in considering whether a party waived its right to arbitrate, "it is significant that [the party] is a plaintiff, rather than a defendant, moving for arbitration," for the party's decision to file its lawsuit may be "inconsistent[] with its contractual right to arbitration." *La. Stadium*, 626 F.3d at 160 (quoting *PPG Indus.*, 128 F.3d at 109). On the other hand, courts in this district have found that, under certain circumstances, a party's "initial decision to initiate both arbitral and judicial proceedings" may be "perfectly reasonable" where a party seeks "to protect [its] rights by commencing both kinds of proceedings." *Jock v. Sterling Jewelers, Inc.*, 564 F. Supp. 2d 307, 309, 311 (S.D.N.Y. 2008). In *Freeman v. Complex Computing Co.*, 931 F. Supp. 1119 (S.D.N.Y. 1996), *aff'd in part, rev'd in part on other grounds*, 119 F.3d 1044 (2d Cir. 1997), for example, the district court found that a plaintiff did not waive its right to arbitrate by commencing a lawsuit, where the plaintiff had an express agreement to arbitrate with one defendant, but not with the two other defendants, and "sought a single forum in which he could be sure of the right to proceed against all parties." *Id.* at 1119. The same rationale may have been behind Plaintiffs' decision to initiate this action: although Plaintiffs knew that they could seek to arbitrate the dispute against IMG, they lacked an express arbitration agreement with Viacom and sought to resolve the dispute against all parties in a single action. Moreover, Plaintiffs' decision to amend their complaint does not clearly indicate a preference for litigation over arbitration because each of Plaintiffs' amended complaints sought "an injunction in aid of arbitration" against IMG. *See* FAC ¶¶ 227–37; SAC ¶¶ 229–39. Thus, although Plaintiffs' commencement of this litigation "gives pause," *Freeman*, 942 F. Supp. at 1119, it is not sufficient to infer waiver of their right to arbitrate.

14

Finally, Defendants have not demonstrated sufficient "proof of prejudice" to support a finding of waiver. *La. Stadium*, 626 F.3d at 159. Defendants' substantive responses to Plaintiffs' three complaints have no doubt been costly—indeed, IMG suggests that Defendants have incurred "tens of thousands of dollars in fees and costs" in preparing and filing their motions to dismiss. IMG Opp'n Mem. at 10 (ECF No. 85). It is also true, as Defendants argue, that Defendants would suffer some substantive prejudice if compelled to arbitrate, for their motions to dismiss have provided Plaintiffs a view of the legal arguments they would likely assert in arbitration. *See, e.g.*, *La. Stadium*, 626 F.3d at 160. This prejudice stems, in part, from Plaintiffs' dual-track approach to resolving this dispute: Defendants were required to spend money and reveal their legal positions because Plaintiffs chose to pursue arbitration in tandem with litigation. But this prejudice is also a result of IMG's delay in submitting to arbitration. After stating that it was "happy to have a mediation" in February 2016—approximately one month after Plaintiffs filed their complaint— IMG refused Plaintiff's formal mediation request with the AAA and filed a motion to dismiss on May 2, 2016. *See* ECF Nos. 33, 47-2, 51-1.[4] Defendants could have avoided the costs of litigating this action had IMG followed through with its initial agreement to mediate, and had Viacom then held the action in abeyance as it had agreed to do. Thus, the prejudice that Defendants may now suffer if compelled to arbitrate, for which they are at least partly responsible, is not sufficient to find that Plaintiffs waived their right to arbitrate.

In sum, the Court concludes that Plaintiffs have not waived their right to arbitration.

---

[4] Viacom, for its part, agreed to "hold the action in abeyance pending [Plaintiffs'] anticipated mediation with IMG" on January 13, 2016, *see* ECF No. 51-1, yet moved to dismiss Plaintiffs' First Amended Complaint and Second Amended Complaint on May 2, 2016 and June 13, 2016, respectively, *see* ECF Nos. 29, 56.

15

## B. Arbitrability

Defendants next argue that, even if Plaintiffs preserved their right to seek arbitration, this dispute is not arbitrable. *See* IMG Opp'n Mem. at 12–16 (ECF No. 85); Viacom Opp'n Mem. at 16–19 (ECF No. 87). The Court concludes that the arbitrability of Plaintiffs' claims against IMG is for the arbitrator to decide but that Viacom may not be compelled to arbitrate on the basis of the Foundation's arbitration agreement with IMG Productions.

### 1. IMG Defendants

"The law generally treats arbitrability as an issue for judicial determination 'unless the parties clearly and unmistakably provide otherwise.'" *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). The Second Circuit has held that when the parties explicitly incorporate into an arbitration agreement the AAA's Commercial Arbitration Rules, including a rule which empowers the arbitrator to rule on her own jurisdiction, "the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005). Thus, "a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules" may not "disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Id.* at 211 (emphasis in original); *see also, e.g., Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 518 F. App'x 20, 21 (2d Cir. 2013) (summary order) ("[B]y incorporating the American Arbitration Association ('AAA') rules the parties agreed to have the arbitrators decide arbitrability."); *Arshad v. Transp. Sys., Inc.*, 183 F. Supp. 3d 442, 447 (S.D.N.Y. 2016).

The arbitration provision of the work-for-hire agreement between the Foundation and IMG Productions provides, in relevant part, that any dispute arising under the agreement that cannot be

16

resolved through mediation "will be submitted to arbitration and resolved by a single arbitrator . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect." SAC Ex. 1 § 12(b). Rule 7 of the Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Commercial Arbitration Rules & Mediation Procedures 7(a). Thus, the incorporation of the AAA Rules into the work-for-hire agreement serves as clear and unmistakable evidence that the Foundation and IMG Productions, LLC agreed to delegate any questions of arbitrability to the arbitrator. *See Contec*, 398 F.3d at 208.

IMG argues, however, that WME IMG cannot be compelled to arbitrate because it was not a party to the work-for-hire agreement. *See* IMG Opp'n Mem. at 16–18 (ECF No. 85). This argument is not persuasive. "In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement." *Contec*, 398 F.3d at 209. In *Contec*, for example, the Second Circuit held that arbitration of arbitrability was appropriate on a claim asserted by one of the signatories' corporate successors, where there was an "undisputed relationship" between the non-signatory successor corporation and its predecessor and where "the parties continued to conduct themselves as subject to [the agreement] regardless of the change in corporate form." *Id.* Because these factors demonstrated a "sufficient relationship" between the signatory corporation and its successor, the Second Circuit held that the question of whether the non-signatory successor may claim rights under the agreement was for the arbitrator to decide. *Id.*

Similarly here, there is a "sufficient relationship" between IMG Productions, LLC and WME IMG to delegate the question of WMG IMG's rights under the work-for-hire agreement to

17

the arbitrator. *Id.* Plaintiffs allege that WMG IMG is the "successor-in-interest or parent of or otherwise responsible for satisfying any judgment against IMG Productions, LLC." SAC ¶ 30. Plaintiffs also allege that "IMG was acquired by WME to form WME IMG" in 2014. SAC ¶ 61. IMG claims that Plaintiffs' allegations are "superficial at best," but it does not genuinely dispute the allegations or provide any evidence suggesting that WME IMG, LLC and IMG Productions, LLC lack the corporate relationship Plaintiffs describe. IMG Opp'n Mem. at 18. Moreover, as in *Contec*, the two IMG entities have "continued to conduct themselves as subject to [the agreement] regardless of the change in corporate form." 398 F.3d at 209. For example, Plaintiffs have provided evidence, in the form of a declaration by Katsoris, that an IMG representative who negotiated the work-for-hire agreement met with Katsoris in 2015—a year after WME allegedly acquired IMG—to discuss the TV Special, and that this same representative shared the TV Special with "his colleagues at IMG's parent, WME IMG." Katsoris Decl. ¶¶ 43–44 (ECF No. 67).[5] While the Court need not decide whether WME IMG, LLC is, in fact, bound by the arbitration agreement signed by IMG Productions, LLC, there is a "sufficient relationship" between the two entities on the current record to delegate this question to the arbitrator. *Contec*, 398 F.3d at 209; *see also Lismore v. Societe Generale Energy Corp.*, No. 11-CV-6705 (AJN), 2012 WL 3577833, at \*5 (S.D.N.Y. Aug. 17, 2012) (finding that arbitrability was delegated to the arbitrator under *Contec*, where the agreement incorporated the AAA Rules and there was an undisputed relationship between the plaintiff and the parent company of a signatory to the arbitration

---

[5] In addition, during the course of this litigation, WME IMG and IMG Productions have conducted themselves as though they are both subject to the agreement by, for example, stipulating that the two entities—labeled "together, the 'WME Defendants'"—would "explore the potential for mediation of their dispute" with Plaintiffs. *See* Order (Mar. 16, 2016) (ECF No. 25).

agreement).[6]

IMG also suggests that Katsoris may not assert a right to arbitrate under the agreement because he did not sign the agreement. Under *Contec*, however, Katsoris and IMG plainly have a "sufficient relationship" to refer the question of Katsoris's rights under the work-for-hire agreement to the arbitrator. *Contec*, 309 F.3d at 209. Katsoris negotiated the work-for-hire agreement himself. *See, e.g.*, Katsoris Decl. ¶¶ 15–37 (ECF No. 67); *see also* SAC ¶ 99. Moreover, Katsoris approached IMG in 2012—two years before the Foundation was formed—to pitch the idea of a reality television show and traveled with IMG producers to pitch the show to television networks. *See* Katsoris Decl. ¶ 10; *see also* SAC ¶¶ 78–82. Katsoris also visited IMG's offices to develop marketing materials based on the TV Special, which was produced pursuant to the work-for-hire agreement. *See* Katsoris Decl. ¶ 44; SAC ¶ 103. There can also be no question of Katsoris's relationship to the Foundation: he is the Foundation's founder and president. SAC ¶¶ 27, 48. Under these circumstances, the Court concludes that, although Katsoris is not a signatory to the work-for-hire agreement, his relationships to the signatories of the arbitration agreement and to the rights created under the agreement are sufficient for the arbitrator to decide the arbitrability of his claims. *See Contec*, 309 F.3d at 209.

### 2. Viacom

Plaintiffs argue that Viacom may also be compelled to arbitrate on the basis of the work-

---

[6] *Cf. JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (finding that non-signatory parent companies were bound by arbitration agreements signed by their subsidiaries, where the parent and subsidiary companies had a "close relationship" and where claims against the parent companies were "undeniably intertwined" with the terms of the agreements containing arbitration provisions); *Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280 (2d Cir. 2003) (holding that a non-signatory company could be compelled to arbitrate under an agreement entered by a company with the same corporate parent, where evidence suggested a "close relationship" among the entities and that signatory "treated the [non-signatory] as if it were a signatory").

for-hire agreement. *See* Pls.' Mem. at 14–16 (ECF No. 69).[7] The Court disagrees. As an initial matter, Viacom rightly notes that it did not sign the work-for-hire agreement and is not mentioned therein. *See* SAC Ex. I. Viacom is thus correct that this is not a case in which a non-signatory is "linked textually" to an arbitration agreement and may therefore be bound by its terms. *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 407 (2d Cir. 2001).

The Second Circuit has, however, "made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)). More specifically, the Circuit has "recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id*.

In this case, Plaintiffs advance an estoppel argument. *See* Pls.' Mem. at 15–16 (ECF No. 69). "Estoppel of an unwilling non-signatory requires a showing . . . that the non-signatory 'knowingly exploited' the benefits of an agreement with an arbitration clause and derived a 'direct benefit' from the agreement." *AICO Int'l, E.C. v. Merrill Lynch & Co.*, 98 F. App'x 44, 46 (2d Cir. 2004) (summary order) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp.*, 268 F.3d 58, 61–62 (2d Cir. 2001)). "The benefits must be direct—which is to say, flowing directly from the agreement." *MAG Portfolio*, 268 F.3d at 61. In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993), for example, a foreign accounting firm received a

---

[7] Plaintiffs do not argue that the question of whether Viacom may be bound by the arbitration agreement is for the arbitrator to decide. To the extent that Plaintiffs do make this argument, the Court rejects it: as discussed below, Viacom lacks a "sufficient relationship" to the parties and to the rights created under the work-for-hire agreement to infer that arbitration of the arbitrability of Plaintiffs' claims against Viacom is appropriate. *See Contec*, 398 F.3d at 209.

settlement agreement, which permitted certain parties to use the trade name "Deloitte" and which required those parties to arbitrate their disputes, and proceeded to use the trade name without objecting to the terms of the agreement. *See* 9 F.3d at 1062–64. The Second Circuit held by "knowingly accept[ing] the benefits of the Agreement" and "fail[ing] to object to the Agreement when it received it," the firm was "estopped from denying its obligation to arbitrate" under the agreement despite never having signed it. *Id*. at 1064; *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (holding that yacht owners were estopped from denying their obligations to arbitrate under an agreement between a shipyard and a yacht inspection organization, where the owners received "several direct benefits" from the agreement, including "significantly lower insurance rates" and "the ability to sail under the French flag").

"By contrast, the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio*, 268 F.3d at 61. In *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995), for example, two companies entered into an exclusive supplier agreement, which contained a mandatory arbitration provision. *Id.* at 775. A third-party competitor purchased one of the signatory companies with the goal of squeezing the remaining company out of the market. *Id.* The non-signatory competitor "benefited" from the agreement, in that its acquisition of one of the signatory companies allowed it to eliminate the other as a competitor. *See id.* at 779. Distinguishing *Deloitte*, the Second Circuit held the non-signatory's benefit was nonetheless too "indirect" to support an estoppel theory that would compel it to arbitrate, as this benefit did not "derive[] directly" from the agreement itself—as the accounting firm's use of a trade name did in *Deloitte*—but rather flowed indirectly from its acquisition of one of the agreement's signatories. *Id.*; *see also MAG Portfolio*, 268 F.3d at 63.

The Second Circuit also has explained that a non-signatory cannot be compelled to arbitrate under an estoppel theory where "the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit." *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011) (citing *Tencara Shipyard*, 170 F.3d at 351–53 and *Thomson–CSF*, 64 F.3d at 778–79). In *Ross v. American Express Co.*, 547 F.3d 137 (2d Cir. 2008), for example, a group of credit card holders sued their credit card company and the banks that issued the cards for violating federal antitrust law; the cardholders' agreements with the issuing banks contained mandatory arbitration clauses but did not mention the credit card company itself. *See* 547 F.3d at 139–40. The non-signatory credit card company moved to compel arbitration, arguing that the cardholders were estopped from avoiding arbitration because their claims were "intertwined" with their cardholder agreements with the issuing banks. *See id.* The Second Circuit rejected that argument, explaining that "the necessary circumstance of some relation between [the credit card company] and the plaintiffs sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute with [the credit card company] is utterly lacking here," where the credit card company "did not sign the cardholder agreements, it is not mentioned therein . . . it had no role in their formation or performance," and it was "not in any in way treat[ed] . . . as a party to the cardholder agreements." *Id.* at 146; *see also Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361–62 (2d Cir. 2008).

Here, Plaintiffs have not demonstrated that Viacom "knowingly exploited" the work-for-hire agreement or derived any "direct benefit" from it. *MAG Portfolio*, 268 F.3d at 61–62. Plaintiffs argue that the "direct benefit" to Viacom was receiving the concept of a reality television series as presented in the TV Special. *See* Pls.' Mem. at 15–16 (ECF No. 69). Even assuming that Viacom received the benefit of Plaintiffs' concept and used it as a basis for its own television

22

series, this benefit does not "flow[] directly from the agreement." *MAG Portfolio*, 268 F.3d at 61. The work-for-hire agreement is, in essence, a production agreement: it addresses how the TV Special must be produced, not how it is to be distributed, sold, or licensed to third-party television networks like Nickelodeon. *See* SAC Ex. I. The agreement sets forth the obligations of IMG, as producer, but it is silent as to the obligations of any third parties who may wish to acquire rights in the TV Special IMG produced. *See id.* Because the scope of the agreement is limited to the production of the TV Special, and does not extend to distribution of rights to it, it does not address the very "benefit" Plaintiffs claim that Viacom has received here. Therefore, any benefits that Viacom derived from the work-for-hire agreement are indirect and do not support a finding that Viacom is estopped from avoiding arbitration.

Of course, there is some connection between the subject of the work-for-hire agreement and the benefit Viacom allegedly received: both relate to Plaintiffs' idea for a television series. But as the Second Circuit has made clear, the question in analyzing estoppel is not whether the non-signatory has some relationship to the subject matter of an agreement containing an arbitration provision, but rather whether the benefits the non-signatory receives derive directly from "the agreement itself." *MAG Portfolio*, 268 F.3d at 61. In *Thomson-CSF*, for example, the Second Circuit rejected an estoppel argument where a third-party competitor benefited from an exclusive supplier agreement of a company it acquired not because it intended to invoke the agreement or exploit any benefits provided in the agreement itself—by, for example, "seeking to purchase equipment" under the supplier agreement—but rather because its ownership of one of the signatories allowed it to squeeze out a competitor. *See* 64 F.3d at 779. Similarly here, while the formation of the work-for-hire agreement resulted in the production of the TV Special, which may have put Viacom in a better position to distribute a television series, Viacom could not have

obtained this benefit by invoking any rights under the agreement itself. Thus, though the work-for-hire agreement and the benefit Viacom allegedly received both involve a television series, the link between Viacom's benefit and the agreement itself is too attenuated to estop Viacom from refusing to arbitrate under it.

While Plaintiffs rely on the Second Circuit's decision in *Deloitte* in support of their estoppel argument, *see* Pls.' Mem. at 14–15, the distinctions between this case and *Deloitte* are instructive. In *Deloitte*, the agreement containing an arbitration provision provided for the use of the trade name "Deloitte," and an accounting firm was compelled to arbitrate largely because it received precisely that benefit—the use of the "Deloitte" name. *See* 9 F.3d at 1064. The analogous scenario here would be if the agreement set forth the conditions under which a party could use Plaintiffs' concept in distributing a television show, much like an agreement to use the "Deloitte" trade name—in that case, the benefit Viacom allegedly received would correspond more directly to the agreement itself. *See id.* But the agreement gives no party such a benefit, and it provides Viacom no opportunity to "exploit" the agreement and claim this benefit for itself.

It is true, as Plaintiffs note, that the work-for-hire agreement indicates that the Foundation intended to market the TV Special to television networks. Specifically, Section 3 of the agreement provides that "[i]t is understood and agreed that [the Foundation] is seeking an offer to enter into a transaction to finance, license, and exhibit and/or distribute a television production or productions" based on the TV Special. SAC Ex. I § 3. The work-for-hire agreement thus represents one step in the process of accomplishing that goal: IMG's production of the TV Special would provide Plaintiffs the material they needed to market their proposal for "a television production or productions." *Id.* By its terms, however, the agreement is one step removed from what Plaintiffs claim Viacom did here—exhibiting or distributing a television series based on the

24

TV Special. *See, e.g.*, SAC ¶¶ 159–64, 172, 175, 178. The agreement could not set forth the terms under which a network, such as Nickelodeon, could distribute such a television series, as the agreement was premised on the fact that the material a television network could use to do so did not yet exist. *See* SAC Ex. I § 3. Accordingly, despite the agreement's recitation of Plaintiffs' ultimate objective, any benefits Viacom may have derived from the work-for-hire agreement do not flow from the agreement itself.

Finally, Plaintiffs have not shown that they and Viacom have a relationship "sufficient to demonstrate that [they] intended to arbitrate this dispute" with Viacom. *Ross*, 547 F.3d at 146. As in *Ross*, Viacom "did not sign the [work-for-hire] agreement[], it is not mentioned therein, and it had no role in [the agreement's] formation or performance." *Id.* Even if Plaintiffs and IMG anticipated showing the TV Special or a portion thereof to Nickelodeon as marketing material, *see* Katsoris Decl. ¶ 40 (ECF No. 67), Plaintiffs have provided no evidence that the parties intended to bind Viacom to the work-for-hire agreement itself. Rather, Plaintiffs' allegations suggest that they hoped to use the TV Special to form a new agreement with Viacom, under which Viacom would finance, license, or otherwise distribute a television show based on Plaintiffs' marketing materials. Thus, Plaintiffs and IMG would have no basis to expect that Viacom would be bound by this agreement, when they implicitly acknowledged that an agreement with Viacom could only be formed *after* they fulfilled their obligations under their work-for-hire agreement.

Accordingly, Viacom may not be compelled to arbitrate Plaintiffs' claims on the basis of the arbitration provision in the Foundation's work-for-hire agreement with IMG Productions, LLC.

**C. Stay**

Plaintiffs request that the Court stay this action pending arbitration. Pls.' Mot. at 16–19. Defendants oppose this request. The Court concludes that a stay of this action against all

Defendants is appropriate pending Plaintiffs' arbitration with IMG.

The FAA requires a district court, "on application of one of the parties," to stay an action after determining that "any issue" in the action is "referable to arbitration." 9 U.S.C. § 3. In *Katz v. Cellco Partnership*, 794 F.3d 341 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 596 (2015), the Second Circuit clarified that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested." 794 F.3d at 347. *Katz* did not explicitly address whether the FAA requires a district court to stay all proceedings where, as here, fewer than all claims have been referred to arbitration. *See id.* at 345 n.6. Prior to *Katz*, however, the Second Circuit stated that "[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987); *see also, e.g.*, *White v. Cantor Fitzgerald, L.P.*, 393 F. App'x 804, 808 (2d Cir. 2010) (summary order) ("[T]he district court is not required to stay the litigation of the nonarbitrable claims before it . . . pending the outcome of any arbitrated claims."); *Chang v. Lin*, 824 F.2d 219, 222 (2d Cir. 1987) ("[W]e have previously allowed courts great discretion in staying nonarbitrable state and federal claims pending arbitration of related claims.").

Thus, whether or not the FAA requires a stay where some but not all claims are referable to arbitration, a district court may stay proceedings in its discretion. "[D]istrict courts . . . may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *WorldCrisa v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997). "The Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Maritima de Ecologia, S.A. de C.V. v. Sealion*

26

*Shipping Ltd.*, No. 10-CV-8134 (DLC), 2011 WL 1465744, at \*5 (S.D.N.Y. Apr. 15, 2011) (citation omitted). "A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Inv'rs, LLC v. Panzer*, No. 14-CV-6852 (KPF), 2015 WL 5052563, at \*11 (S.D.N.Y. Aug. 27, 2015); *see also Moore v. Interacciones Glob., Inc.*, No. 94-CV-4789 (RWS), 1995 WL 33650, at \*7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Panzer*, No. 14-CV-6852 (KPF), 2015 WL 5052563, at \*11; *see CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 846 F.3d 35, 55 (2d Cir. 2017) ("It is settled law that the doctrine of issue preclusion is applicable to issues resolved by an earlier arbitration." (citation omitted)).

Here, even if the FAA does not require the Court to stay Plaintiffs' claims against Viacom, the Court concludes that a discretionary stay is warranted. There is significant factual overlap between Plaintiffs' claims against IMG and those against Viacom. In particular, Plaintiffs' copyright infringement claim, and related claim for declaratory judgment, is asserted against all Defendants. *See* SAC ¶¶ 165–184. This claim focuses on the similarity between Plaintiffs' copyrighted works and Viacom's allegedly infringing television series. *See* SAC ¶ 172. The Court would duplicate efforts if it were to consider the similarities between these works when the arbitrator will be tasked with determining the same issue. Moreover, Katsoris's claim against Viacom for aiding and abetting IMG's breach of fiduciary duty, *see* SAC ¶¶ 220–28, will necessarily involve an inquiry into whether IMG did, in fact, breach a fiduciary duty to Katsoris—

27

another issue the arbitrator must decide, *see* SAC ¶¶ 202–19. In light of the factual overlap between Plaintiffs' non-arbitrable claims against Viacom and their arbitrable claims IMG, the Court finds it appropriate to stay all proceedings in this action pending arbitration. *See, e.g.*, *Winter Inv'rs*, No. 14- CV- 6852 (KPF), 2015 WL 5052563, at \*12 (granting a discretionary stay where the "issues that the arbitration panel will decide . . . overlap significantly (if not entirely) with the issues that this Court would need to reach to adjudicate" non-arbitrable claims); *Maritima de Ecologia*, No. 10-CV-8134 (DLC), 2011 WL 1465744, at \*5 (staying proceedings that were not referred to arbitration where the outcome of ongoing arbitration "will have a significant bearing on this case").

## D. Attorneys' Fees and Sanctions

Plaintiffs and IMG request attorneys' fees under 28 U.S.C. § 1927. The Court denies both parties' requests.

The Court may impose sanctions under both 28 U.S.C. § 1927 and its inherent authority. Section 1927 provides, in relevant part, that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Imposition of a sanction under § 1927 requires a 'clear showing of bad faith.'" *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986) (quoting *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010 (2d Cir. 1986)). A district court may also impose sanctions under its inherent authority, which includes "the power to assess costs and attorneys' fees against either the client or his attorney where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) (internal quotation marks omitted). Sanctions made pursuant

28

to either § 1927 or to the court's inherent power are "proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri*, 803 F.2d at 1273.

Plaintiffs seeks to recover attorney's fees because, in their view, IMG refused to arbitrate without a legitimate legal basis. *See* Pls.' Mem. at 20–21 (ECF No. 69). While the Court finds that IMG was required to arbitrate this dispute, it does not find that IMG's position to the contrary was "completely without merit." *Oliveri*, 803 F.2d at 1273. In light of Plaintiffs' decision to initiate this action, IMG may have reasonably, if erroneously, determined that Plaintiffs had waived their right to arbitrate and decided to litigate instead. Accordingly, Plaintiffs have not made a "clear showing of bad faith" and are not entitled to sanctions against IMG. *Id.*

IMG argues that the Court should sanction Plaintiffs because of their delay in moving to compel arbitration. IMG Opp. Mem. at 19. As discussed above, Plaintiffs' delay in moving to compel arbitration was reasonable in light of the terms of the arbitration agreement and Plaintiffs' efforts, through communications with IMG, the Court, and the AAA, to initiate mediation. IMG's request for sanctions is therefore denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel arbitration against WME IMG, LLC and IMG Productions, LLC is granted, and this action is stayed against all Defendants.

SO ORDERED.

Dated:   February 27, 2017
         New York, New York

Ronnie Abrams
United States District Judge

29